UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPEN SOCIETY JUSTICE INITIATIVE,<br><br>                                        Plaintiff,<br>              -v-<br><br>CENTRAL INTELLIGENCE AGENCY, et al.,<br><br>                                        Defendants. | 19 Civ. 234 (PAE)<br>19 Civ. 1329 (PAE)<br><br><u>OPINION & ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

          This case involves Freedom of Information Act ("FOIA") requests by the Open Society

Justice Initiative ("OSJI") to a variety of federal agencies seeking information regarding the

murder of Jamal Khashoggi, a U.S. resident, Saudi Arabian national, and *Washington Post*

columnist who was not seen again after entering the Saudi consulate in Istanbul on October 2,

2018.  *See* Dkt. 1[1] ("Compl.") ¶ 9.  Pending now are cross-motions for summary judgment by

plaintiff OSJI and two defendants—the Central Intelligence Agency ("CIA") and the Office of

the Director of National Intelligence ("ODNI")—pursuant to Federal Rule of Civil Procedure 56.

For the reasons that follow, the Court grants each motion in part and denies each in part.

---

[1] These consolidated cases include 19 Civ. 234 and 19 Civ. 1329.  Citations to the docket in this
decision refer to the docket in lead case 19 Civ. 234 unless otherwise specified.

I.      **Background**[2]

A.      **Factual Background**

On October 2, 2018, Khashoggi entered the Saudi consulate in Istanbul.  Pl. Mem. at 3.

He never left alive.  On October 19, 2018, the Saudi Government acknowledged that Khashoggi

had been killed inside the consulate.  *Id.* at 4.

In public statements, both the President and Vice President of the United States disclosed

that federal government officials had participated in an investigation of the murder.  On

October 23, 2019, Vice President Pence told reporters that CIA Director Gina Haspel had

traveled to Turkey to review evidence.  Pl. Mem. at 4, 17; Def. Opp'n at 16.  In an interview on

November 18, 2018, President Trump stated that "we" have possession of a tape of Khashoggi's

murder, and that he had "been fully briefed on it."  Pl. Mem. at 4–5; Def. Opp'n at 17–20.  On

November 20, 2018, President Trump publicly stated:  "After great independent research, we

now know many details of this horrible crime," and that American "intelligence agencies

[would] continue to assess all information."  Pl. Mem. at 5.  And, on November 22, 2018, when

asked about the CIA's conclusions regarding the killing, the President responded that the CIA

---

[2] The Court draws its account of the underlying facts from the parties' respective motions for summary judgment, including: the agencies' joint memorandum of law in support of their motion for summary judgment, Dkt. 116 ("Def. Mem."); the unclassified declaration of Antoinette B. Shiner, Information Review Officer for the Litigation Information Review Office, CIA, in support of the motion, Dkt. 112 ("Public Shiner Decl."); the unclassified declaration of Patricia Gaviria, Director, Information Management Division, ODNI, also in support of the motion, Dkt. 113 ("Public Gaviria Decl."); OSJI's memorandum of law in opposition to that motion and in support of their cross-motion for summary judgment, Dkts. 124, 125 ("Pl. Mem."); the agencies' memorandum of law in opposition to OSJI's motion for summary judgment and reply in support of their motion, Dkt. 139 ("Def. Opp'n"); OSJI's reply, Dkt. 147 ("Pl. Reply"); and the transcript of oral argument, held October 15, 2020, Dkt. 172 ("Arg. Tr.").

"did not come to a conclusion" as to the Saudi Crown Prince's potential involvement in the killing. *Id.*

Other U.S. officials later made further public statements regarding the Khashoggi killing and/or U.S. investigations into it. On November 23, 2018, Senator Jack Reed stated that the CIA had concluded that the Crown Prince of Saudi Arabia had been directly involved in Khashoggi's assassination. *Id.* at 6–7. On November 29, 2018, Defense Secretary James Mattis stated that he had read translations of the tape of Khashoggi's killing and had reviewed intelligence regarding the matter. *Id.* at 5–6; Def. Opp'n at 17–18. On December 4, 2018, Senator Lindsey Graham stated that the Crown Prince was responsible for Khashoggi's death. Pl. Mem. at 7; Def. Opp'n at 21. And, on January 29, 2019, CIA Director Haspel testified before the Senate Select Committee on Intelligence that "during the fall months, [the CIA] spent a significant amount of time briefing and providing written products on our assessment of what happened to Mr. Jamal Khashoggi." Def. Opp'n at 19.

### B.      Procedural History

On December 4, 2018, OSJI filed the FOIA requests at issue. *See* Compl. ¶ 25. OSJI filed such requests with seven federal agencies, including the CIA and ODNI, requesting in each "all records relating to the killing of U.S. resident Jamal Khashoggi, including but not limited to the CIA's findings on and/or assessment of the circumstances under which he was killed and/or the identities of those responsible." *Id.*

On January 9, 2019, after no agency had released any responsive records, OSJI filed this lawsuit, against all seven agencies, seeking orders directing compliance with its FOIA requests. *See* Compl. On March 18, 2019, the defendants answered. Dkt. 24. On April 23, 2019, the Court issued a scheduling order governing the agencies' document production. Dkt. 30.

Relevant here,[3] by May 10, 2019, the CIA and ODNI had completed their searches for potentially responsive records.  Dkts. 30, 43, 49.  Between July 1 and August 7, 2019, the CIA produced 217 responsive documents, all from the agency's press office.  Pl. Mem. at 9.  By letter, the CIA notified OSJI that other responsive records and any descriptive information about such references were classified and covered by one or more FOIA exemptions.  *Id.*  ODNI similarly produced 48 responsive documents between June 28 and August 5, 2019, each from its press office.  *Id.*  ODNI sent a similar letter to OSJI stating that any remaining responsive records, and any descriptive information about them, were covered by FOIA exemptions.  *Id.* at 9–10.

On December 9, 2019, the agencies filed a joint motion for summary judgment supported by two publicly filed declarations, *see* Dkts. 111–13, and two classified declarations filed *ex parte* and under seal.  In their accompanying memorandum of law, the CIA and ODNI acknowledged that the law did not permit them to provide a *Glomar* response to OSJI's FOIA requests—*i.e.*, a response stating that the agency could neither confirm nor deny the existence of responsive records—because the U.S. government had "acknowledged that the intelligence community has assessed information concerning Mr. Khashoggi's killing."  Def. Mem. at 1–2.  Nevertheless, the agencies argued, the responsive records that each withheld, and descriptions of them, were all properly withheld in full pursuant to FOIA Exemptions 1 and 3.  *Id.* at 3.  They also argued that portions of these materials were subject to Exemptions 5 and 6.  *Id.*  The

---

[3] Aspects of this litigation pertaining to other agency defendants have been consequential, *see, e.g.*, Dkt. 90 (decision denying Government's motion to reconsider order requiring Departments of State and Defense each to process at least 5,000 pages per month in response to OSJI's request given the public importance of the Khashoggi murder), but, because the instant motions concern only the CIA and ODNI, the Court here reviews the history of this litigation only as relevant to those two defendants.

4

agencies argued that, because any further detail regarding the remaining responsive records, including the nature and volume of these records, was classified and protected from disclosure by statute, the agencies could provide only a collective "no number, no list" response to the request for these records. *Id.* at 2.

On January 21, 2020, OSJI filed a cross-motion for summary judgment. It argued that the two agencies' "no number, no list" response was not permitted under FOIA, in particular, because some of the information the agencies proposed to withhold is already a matter of public record, having been disclosed by U.S. government officials. Pl. Mem. at 2. OSJI asks the Court to order the CIA and ODNI to produce a *Vaughn* index that enumerates and describes each withheld record, or file a declaration specifying why the information for each record is being withheld. *Id.* at 3.

On March 10, 2020, the agencies filed a brief in opposition to OSJI's cross-motion and in further support of their own. Def. Opp'n. On March 31, 2020, OSJI filed a reply. Pl. Reply. On October 15, 2020, after a delay prompted by the intervening public health crisis, the Court held argument.

## II. Applicable Legal Standards

### A. Standards Governing Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 US. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## B.     Summary Judgment Motions Under FOIA

FOIA governs public access to information held by the federal government. "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). However, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information, and therefore provided the specific exemptions under which disclosure could be refused." *Id.* (citation omitted). "Recognizing past abuses, Congress sought to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (citation omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (citations omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). Courts review the adequacy of the agency's justifications *de novo*. *Id.* Even where portions of a responsive record are properly exempt, the agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II); *see FBI v. Abramson*, 456 U.S. 615, 626 (1982).

Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response. *See, e.g.*, *Johnson v. CIA*, No. 17 Civ. 1928 (CM), 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73 (citation omitted). An agency's affidavits in support of its nondisclosure are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks and citation omitted). However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation omitted).

7

Relevant here given the nature of OSJI's request, courts are to take a more "deferential posture in FOIA cases regarding the uniquely executive purview of national security" and accord "substantial weight" to agencies' declarations predicting harm to national security.  *Id.* at 73, 76; *see also Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) (where agency affidavits appear sufficient, "the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency").

### 1.  Vaughn Indexes, *Glomar* Responses, and "No Number, No List" Responses

"Once a FOIA request has been made for documents, the preparation of a *Vaughn* index is now an accepted method for the Government to identify responsive documents and discharge its obligation to assert any claimed FOIA exemptions to the various documents withheld."  *N.Y. Times Co. v. U.S. Dep't of Justice* ("*N.Y. Times II*"), 758 F.3d 436, 438 (2d Cir.), *supplemented*, 762 F.3d 233 (2d Cir. 2014).  "A *Vaughn* index typically lists the titles and descriptions of the responsive documents that the Government contends are exempt from disclosure."  *Id.* at 438–39; *see Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) ("Agency affidavits sometimes take the form of a '*Vaughn* index,' but there is 'no fixed rule' establishing what such an affidavit must look like.") (citation omitted)).  "[T]he index gives the court and the challenging party a measure of access without exposing the withheld information."  *N.Y. Times II*, 758 F.3d at 439 (alteration in original) (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006)).  And "it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court."  *Id.* at 438–39 (citing *Keys v. U.S. Dep't of Justice,* 830 F.2d 337 349 (D.C. Cir. 1987)).

8

"[P]reparation of a *Vaughn* index is not required," however, if, in response to a FOIA request, an agency issues what is known as a *Glomar* response.  *Id.* at 438 n.3.  In a *Glomar* response, the agency "refus[es] to confirm or deny the existence of requested records because acknowledging even the existence of certain records would reveal information entitled to be protected."  *Id.*  But an agency "loses its ability to provide a *Glomar* response when the existence or nonexistence of the particular records covered by the *Glomar* response has been officially and publicly disclosed."  *Wilner*, 592 F.3d at 70.  An official acknowledgement can occur directly or indirectly, the latter occurring when the "substance of an official statement and the context in which it is made permits the inescapable inference that the requested records in fact exist."  *James Madison Project v. Dep't of Justice*, 302 F. Supp. 3d 12, 22 (D.D.C. 2018).  A Court can simply infer from an agency's repeated public statements about a government program that the agency possesses at least some documents related to that program.  *See Am. Civil Liberties Union v. CIA* ("*ACLU v. CIA*"), 710 F.3d 422, 431 (D.C. Cir. 2013) (Garland, C.J.).

Where an official acknowledgment prevents an agency from providing a *Glomar* response, agencies in certain recent cases have declined to file a *Vaughn* index describing the withheld records.  They have instead submitted "a 'no number, no list' response," in which the agency "acknowledge[es] that it ha[s] responsive documents, but declin[es] to further describe or even enumerate on the public record the number, types, dates, or other descriptive information about these responsive records."  *Id.* at 433 (internal citation omitted).

Unlike a *Glomar* response, which "requires the agency to argue, and the court to accept, that the very fact of the existence or nonexistence of responsive records is protected from disclosure," a "no number, no list" response enables the agency to acknowledge that it

possesses some documents, while arguing "that any description of those documents would effectively disclose validly exempt information." *Id.* However, "[a]n agency may [only] withhold information on the number of responsive documents and a description of their contents if those facts are protected from disclosure by a FOIA exemption." *N.Y. Times Co. v. U.S. Dep't of Justice* ("*N.Y. Times I*"), 756 F.3d 100, 122 (2d Cir.), *opinion amended on other grounds*, 758 F.3d 436 (2d Cir.), *supplemented on other grounds*, 762 F.3d 233 (2d Cir. 2014). And, "[s]uch a response would only be justified in unusual circumstances, and only by a particularly persuasive affidavit." *Id.* (quoting *ACLU v. CIA*, 710 F.3d at 433).

## 2.     FOIA Exemption One

Here, the Government bases its argument that a "no number, no list" response is justified on FOIA Exemption One. FOIA Exemption One "exempts from disclosure records that are 'specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy,' and 'are in fact properly classified pursuant to such Executive order.'" *Ctr. for Const. Rights v. CIA*, 765 F.3d 161, 164 (2d Cir. 2014) (quoting 5 U.S.C. § 552(b)(1)).

The Court accordingly reviews here the Executive Order setting criteria for classification of such records on which the agencies rely in invoking Exemption One—and an exception that can defeat its invocation.

### a.     *Executive Order 13,526*

The CIA and ODNI claim that the existence or not of responsive records is classified under Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13,526"). Def. Mem. at 11. Section 1.1(a) of E.O. 13,526 states that national security information "may be originally classified under the terms of this order only if all of the following conditions are met":

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 13,526 § 1.1(a)(1)–(4).  Section 1.4 of the order, in turn, permits classification of

information that, if disclosed, "could reasonably be expected to cause identifiable or describable

damage to the national security . . . and . . . pertains to one or more" of the listed categories of

activity.  *Id.* § 1.1(4).

The agencies here claim, in their publicly filed declarations, that the responsive records

withheld fall into two categories listed in § 1.1(4) of E.O. 13,526: (1) "intelligence activities

(including covert action), intelligence sources or methods, or cryptology" and (2) "foreign

relations or foreign activities of the United States, including confidential sources."  *Id.* § 1.4(c),

(d); Def. Mem. at 12.  And courts are to give deference "to executive affidavits predicting harm

to the national security, and have found it unwise to undertake searching judicial review."  *Am.*

*Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012) (citation omitted).

>           b.      *Waiver of FOIA Exemption One by an Official Acknowledgment*

The Government can, however, waive its ability to resist disclosure based on this

exemption.  "Voluntary disclosures of all or part of a document may waive an otherwise valid

FOIA exemption."  *N.Y. Times I*, 756 F.3d at 114 (quoting *Dow Jones & Co. v. U.S. Dep't of*

*Justice*, 880 F. Supp. 145, 150–51 (S.D.N.Y. 1995)).  Accordingly, an agency may not invoke

Exemption One "to prevent public disclosure when the government has *officially* disclosed

the *specific* information being sought." *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 421 (2d Cir. 1989). Indeed, an agency cannot withhold "even properly classified information once the Agency itself has officially disclosed it." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009). However, as the Second Circuit has held, "the application of Exemption 1 is generally unaffected by whether the information has entered the realm of public knowledge[,] . . . [and a] limited exception is permitted only where *the government* has officially disclosed the specific information the requester seeks." *Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999) (emphasis added).

"A plaintiff mounting an official acknowledgment argument 'must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.'" *ACLU v. CIA*, 710 F.3d at 427 (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)). However, as on the broader issue of determining whether a FOIA exemption applies, "the government retains the burden of persuasion that [the] information [sought] is not subject to disclosure under FOIA." *Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 245 (2d Cir. 2006).

In *Wilson*, 586 F.3d at 186, the Second Circuit set out a test governing the relationship between a FOIA request for classified information and prior official disclosures of that information. Under this test, "[c]lassified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) [is] *as specific as* the information previously released," (2) "*match[es]* the information previously disclosed," and (3) was "made public through an official and documented disclosure." *Id.* (second two alterations in original) (emphasis added).

12

"Generally, for information to be 'as specific as' that which was previously disclosed,
there cannot be any 'substantive differences between the content of the [publicly] released
government documents and the withheld information.'"   *Osen LLC v. U.S. Cent. Command*,
969 F.3d 102, 110 (2d Cir. 2020) (quoting *Am. Civ. Liberties Union v. U.S. Dep't of Def.*
("*ACLU v. DoD*"), 628 F.3d 612, 620–21 (D.C. Cir. 2011)) (alteration in original).   Thus, "prior
disclosure of 'general descriptions' does not waive Exemption 1 for withheld documents that are
more 'specific and particular' and that 'would reveal far more . . . than the previously released
records.'"   *Id.* (quoting *ACLU v. DoD*, 628 F.3d at 621); *see also Wolf v. CIA*, 473 F.3d 370, 378
(D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice; instead, the *specific*
information sought by the plaintiff must already be in the public domain by official disclosure.").

As to the second, "matching" prong, "there must be enough of an overlap in subject
matter between disclosed and withheld records to fairly say that the two records 'match'—in
other words, that they present the same information about the same subject."   *Osen LLC*,
969 F.3d at 111–12.   The Second Circuit has clarified that "the 'matching' aspect of the *Wilson*
test" does not require "absolute identity" between the withheld and previously disclosed
information.   *See N.Y. Times I*, 756 F.3d at 120.   *New York Times I* involved a FOIA request for
the opinions or memoranda of the Office of Legal Counsel ("OLC") concerning its basis for
approving as legal the targeted killings of U.S. citizens through drone strikes.   *See id.* at 104.
The Second Circuit held that the Government had officially acknowledged certain aspects of its
purported legal basis by releasing a "white paper" that "virtually parallel[ed]" the legal analysis
in the OLC memorandum, even though the memorandum discussed some secondary issues not
addressed in the white paper.   *Id.* at 116.   Accordingly, given the "substantial overlap" between

the legal analyses in the white paper and the OLC memorandum, *id.*, release of the OLC memorandum "add[ed] nothing to the risk" of damage to national security, *id.* at 120.

However, even where withheld information appears to "match" official acknowledgments, courts are to "take[] care to consider the context of any withheld information, as context itself may convey information that has not been disclosed." *N.Y. Times v. F.B.I.*, 297 F. Supp. 3d 435, 450 (S.D.N.Y. 2017); *see also, e.g.*, *N.Y. Times. v. U.S. Dep't of Justice*, 806 F.3d 682, 686–87 (2d Cir. 2015) ("differences in context" between previously disclosed records and requested records are relevant in determining whether the government has waived exemption under FOIA).  And an official acknowledgement does not compel the disclosure of other classified information where the prior disclosure is merely similar to, or only partially overlaps with, the withheld information.  *See, e.g.*, *Osen LLC*, 969 F.3d at 112 ("[E]ven a 'substantial overlap' between the requested information and previously disclosed information is not enough to establish waiver." (quoting *N.Y. Times v. CIA*, 965 F.3d 109, 116, 119 (2d Cir. 2020))).

## III.    Discussion

The issue presented is whether the CIA and ODNI are justified in issuing a "no number, no list" response for the responsive records they have withheld.  Each agency "acknowledge[s] the existence of one or more additional records responsive to the request," but defends the "no number, no list response" on the ground that they "cannot describe the[se records] on the public record—including by providing details such as the volume of records, their dates, titles or subject matter—without revealing exempt information."  Def. Mem. at 8.

OSJI counters with the following arguments.  First, it argues, FOIA does not permit a blanket "no number, no list" response.  Second, even if such a response is permitted in certain

situations, the agencies may not forgo a *Vaughn* index here under Exemption One because the descriptive information requested has, at least in part, been officially acknowledged. *Id.* at 11–12. Third, the other FOIA exemptions that the defendants generally invoke in their submissions—Exemptions Three, Five, and Six—do not apply to their demand for, or justify the agencies' withholding of, a *Vaughn* index here. And fourth, the agencies have not conducted an adequate search for documents. *Id.* at 12. The Court considers each OSJI argument in turn.

### A. Propriety of Blanket "No Number, No List" Responses

OSJI argues that providing a blanket "no number, no list" response rather than at least a *Vaughn* index "subverts established FOIA requirements." Pl. Mem at 11–13. Because the Second Circuit to date has not upheld a grant of summary judgment on this basis and because in discrete cases other circuits have declined to permit such a response, OSJI argues that a blanket "no number, no list" response is never appropriate. *See id.* at 11–13 & n.23 (citing *N.Y. Times I*, 756 F.3d at 103, 122–23; *ACLU v. CIA*, 710 F.3d at 433).

This argument overreaches. Although the Second Circuit has not yet upheld a grant of summary judgment on this basis, it has pointedly refrained from holding that entry of summary judgment could never be warranted for an agency that has made a "no number, no list" response to a FOIA request. *N.Y. Times I*, 756 F.3d at 121–22. On the contrary, the Circuit has stated that "[a]n agency may withhold information [as to] the number of responsive documents and a description of their contents if those facts are protected from disclosure by a FOIA exemption." *Id.* The Circuit has stated that "unusual circumstances" and a "particularly persuasive affidavit" would be required to justify such a response. *Id.* (quoting *ACLU v. CIA*, 710 F.3d at 433). And other courts have upheld "no number, no list" responses. *See, e.g.*, *Bassiouni v. CIA*, 392 F.3d 244, 247–48 (7th Cir. 2004); *Am. Civil Liberties Union v. FBI* ("*ACLU v. FBI*"),

No. 11 Civ. 7562 (WHP), 2015 WL 1566775, at *1–3 (S.D.N.Y. Mar. 31, 2015) ("[D]isclosure

of responsive records or any further information about them (i.e., their nature or number) would

reveal classified intelligence activities, sources or methods.").

Accordingly, the parties' cross-motions cannot be resolved based on OSJI's argument

that a "no number, no list" response can never be appropriate.  The issue instead is whether, and

to what degree, the agencies have made the showing necessary to justify their claim here that

any further elaboration would reveal classified information protected by Exemption One.

### B.    Scope of Official Acknowledgments

In response to OSJI's request for all CIA and ODNI "records relating to the killing of

U.S. resident Jamal Khashoggi," including any "CIA[] findings on and/or assessment of the

circumstances under which he was killed and/or the identities of those responsible," Compl.

¶ 25, the Government admits that its "official statements [have] acknowledge[d] the government

interest in the subject of this FOIA request, and the existence of one or more responsive

records," Def. Opp'n. at 14.  But, it argues, these acknowledgments are put in general terms,

and as such do not oblige it to disclose the specific nature, date, or volume of any individual

responsive records.  These, it contends, remain exempt under Exemption One.  *Id.*  OSJI, in

contrast, argues that these acknowledgments disable the CIA and ODNI from providing a "no

number, no list" response at all.

In the main, the Government is correct.  Exemption One permits the Government to

withhold records as to which classification is authorized in the interest of national defense or

foreign policy and which have been properly so classified pursuant to an executive order.  5

U.S.C. § 552(b)(1).  The agencies' public affidavits attest that these records have been properly

classified pursuant to E.O. 13,265 and fall within two categories of information protected under

§ 1.4 of that order: "intelligence activities . . . sources or methods" and "foreign relations."  *See* E.O. 13,526 § 1.4(c), (d); Public Gaviria Decl. ¶¶ 27, 29, 30; Public Shiner Decl. ¶¶ 14, 16 20; Def. Mem. at 11–12, 17.  The agencies assert that revealing more about these records— including their dates, nature, and lengths, as a standard *Vaughn* index would disclose—"would give advantage to foreign intelligence services and other groups by giving them insight into what the United States' intelligence capabilities and interests are, or are not, which could enable adversaries to circumvent U.S. intelligence activities, and generally enhance its intelligence or counterintelligence activities at the expense of the U.S. national security."  Def. Opp'n at 9. The agencies' classified filings filed *ex parte*, which the Court has carefully reviewed *in camera*, validate this representation.  And OSJI has not supplied any reason to regard the presumption of good faith accorded to an agency's affidavits as having been rebutted.  *See Carney*, 19 F.3d at 812 (Agency affidavits in support of nondisclosure are "accorded a presumption of good faith.").

Accordingly, except where an official acknowledgment has disclosed a record in a manner specific enough to waive the agency's right to invoke Exemption One, that exemption protects the records that OSJI seeks from compulsory revelation.  Under Second Circuit law, the information sought to be disclosed about the record must be "as specific" as the information that was previously disclosed.  *See, e.g.*, *Osen LLC*, 969 F.3d at 110 (internal quotations omitted). OSJI's contrary premise that a generalized statement such as those made by the President, Vice President, CIA Director, and Defense Secretary regarding the U.S.'s Khashoggi investigation, *see supra* pp. 2–3, can broadly waive the CIA and ODNI's authority under Exemption One to withhold the defining features of a particular document is therefore incorrect.

However, as to two distinct records, OSJI's arguments gain more traction.  These are the

tape of Khashoggi's killing and the CIA's report on the killing.  OSJI argues that the agencies

have specifically disclosed the existence and their possession of these items, barring the agencies

from making a "no number, no list" response.  *See* Pl. Mem. at 11–12; Arg. Tr. at 14–15, 17, 22.

Moreover, OSJI argues, as to the report, the President has also disclosed the CIA's bottom-line

conclusion—that the report "did not come to a conclusion" whether the Saudi Crown Prince had

been involved in the killing.  Pl. Mem. at 5, 17–18.  OSJI argues that, because under FOIA

agencies must produce any reasonably segregable portion of a record that has been officially

acknowledged, the agencies must produce a *Vaughn* index sufficient to list the report and the

tape, and any specifics of these that have been disclosed (*e.g.*, the CIA report's conclusion as to

the Crown Prince's involvement).  *Id.* at 14 (citing *ACLU v. FBI*, 2015 WL 1566775, at *3

("[A]ny portions of a document that fall outside of FOIA's exemptions must be disclosed unless

they are 'inextricably intertwined' with the exempt material." (quoting *Inner City Press*,

463 F.3d at 249 n.10))).

### 1.    The Tape of Khashoggi's Killing

OSJI points to two official acknowledgements bearing on the tape.  On October 23, 2018,

Vice President Pence stated to a reporter that CIA Director Gina Haspel had gone to Turkey to

review evidence of the killing.  Pl. Mem. at 4, 17; Def. Opp'n at 16.  And, on November 18, 2018,

Chris Wallace of Fox News, in an interview of President Trump, noted that "Turkish President

Erdogan says that he has shared a tape with the U.S. and other countries that is of the killing of

Jamal Khashoggi inside the Saudi consulate in Istanbul," and asked the President:  "Have

you . . . either heard the tape yourself or been briefed on it?"  Def. Opp'n at 18.  President

Trump replied:  "We have the tape, I don't want to hear the tape, no reason for me to hear the

tape. . . .  I've been fully briefed on it."  *Id.*  OSJI argues that the head of the Executive Branch himself has acknowledged the Government's review and possession of the tape, and, if more were need by way an official acknowledgment, that Vice President Pence's statement situates the tape (as central evidence of the killing) as having been reviewed specifically by the CIA, making it realistic to infer that the CIA is a particular entity within the Government that possessed the tape.  Arg. Tr. at 18.

The Court agrees, and rejects the Government's bid not to specifically identify the tape, to the extent possessed by either defendant agency, on a *Vaughn* index.  President Trump's statement literally admitted that U.S. "intelligence agencies" had reviewed the tape and that the Government possesses it.  That alone deprives the Government of the ability to claim that a *Vaughn* index listing the tape would disclose new information.  And, although not necessary to this conclusion, to the extent that the CIA might disclaim its own possession of the tape as a fact not publicly known, the Vice President's official statement realistically acknowledged at least the historical possession of it by the CIA at the time of its investigation.  These official statements by the top two officials in the Executive Branch sufficiently acknowledge the tape to preclude the Government from claiming that its identification on a *Vaughn* index would reveal undisclosed classified information.  *See Am. Civil Liberties Union v. Dep't of Def.*, 322 F. Supp. 3d 464, 475 (S.D.N.Y. 2018) ("An official acknowledgement can also occur indirectly, when the substance of an official statement and the context in which it is made permits the inescapable inference that the requested records in fact exist." (quotations omitted)); s*ee also* Pl. Reply at 8–9.

In response, the agencies do not seriously dispute that the above statements have admitted the possession by one or more U.S. intelligence agencies of the tape of the Khashoggi murder.

19

They seize instead on the President's lack of attribution to the two defendant intelligence agencies, noting that the statement "[w]e have the tape," does not, *in haec verba*, reveal whether the CIA or ODNI, or perhaps some other federal instrumentality, had physical possession of it. Def. Opp'n at 18.  But that argument does not carry the day.  The President acknowledged that "intelligence agencies" were "assess[ing] all information" and that the CIA in particular had investigated whether the Crown Prince was involved in the killing.  Def. Mem. at 10.  These statements—corroborated by the Vice President's account of CIA Director Haspel's review of evidence into the killing and Director Haspel's testimony that the CIA had spent significant time assessing "what happened to Mr. Jamal Khashoggi" and briefing and developing "written products" on that issue—effectively admit the intelligence agencies' possession, at least at some point, of the tape, which logically would have been a central piece of evidence in any such investigation.  And the Government does not coherently explain why the physical possession as between the intelligence agencies, once the possession by at least one has been acknowledged, could reveal undisclosed classified information.  The Government does not, for example, suggest that either agency had any hand in creating the tape, such that possession by a particular agency might shed light on the agency's undercover or operational capabilities.  And to the extent that intelligence value could attach for some reason to the fact that more than one intelligence agency had accessed the tape, the President's statement—that U.S. "intelligence agencies [would] continue to assess all information"—effectively disclosed that too.  *Id.*

The Court accordingly finds that the official disclosures of the tape satisfy the "strict test" of *Wilson*, 586 F.3d at 186, and thus waive FOIA Exemption One as to the duty to include the tape on the agencies' *Vaughn* indexes.  *See id.* ("Classified information that a party seeks to obtain . . . is deemed to have been officially disclosed only if it (1) [is] as specific as the

information previously released, (2) match[es] the information previously disclosed . . . ." (alterations in original) (quotations omitted)).  The above official disclosures acknowledging the possession of the tape capturing Khashoggi's killing by multiple intelligence agencies, including specifically the CIA, is as specific as, and matches the information sought by, OSJI's request for a *Vaughn* index as to that unique record.  The agencies thus must produce a *Vaughn* index for that tape.

In so holding, the Court does not require the agencies to report other particulars about the tape on the agencies' *Vaughn* indexes.  On the record at hand, it is not clear that descriptive data regarding this item—such as the date of acquisition of the tape, or other particulars—has been officially disclosed.  This ruling is without prejudice to OSJI's right, upon receipt of a *Vaughn* index listing the tape, to seek such details or the tape itself under FOIA, either on the ground that such is not improperly classified or has been publicly disclosed with sufficient specificity to waive any protection under Exemption One.

### 2.    The CIA Report's on the Khashoggi Killing

OSJI next argues that official disclosures prevent the CIA from declining to identify its report on the Khashoggi killing on a *Vaughn* index, in favor of a collective "no number, no list" response embracing all responsive records possessed by the CIA.  OSJI relies on two official statements.

First, on January 29, 2019, CIA Director Haspel testified before the Senate Select Committee on Intelligence:

> Senator Wyden: Director Haspel: The Senate unanimously passed a resolution stating that the crown prince was responsible for the murder of U.S. resident and journalist Jamal Khashoggi—is that correct?
>
> Director Haspel: Senator, we can go into a little bit more detail this afternoon, but as you know, *during the fall months we spent a significant amount of time briefing and providing written products on our assessment of what happened to Mr. Jamal*

21

> *Khashoggi*.  As you know, and as the Saudi regime itself has acknowledged, fifteen individuals traveled to Istanbul, and he was murdered at their consulate and it was a premeditated murder on 2 October.  The trial in Saudi Arabia, I believe, has begun, but in terms of further detail on our assessment of involvement, I'll hold it until the afternoon.

Def. Opp'n. at 19 (emphasis added).  The Government seeks to diminish this statement, contending that it "goes no further than . . . acknowledge[ing] that the CIA has an interest in the matter and played an analytic role."  *Id.*  That is wrong.  The CIA Director's explicit statement that the agency, along with "briefing," "provid[ed] written products on [its] assessment of what happened to Mr. Jamal Khashoggi," effectively admits the CIA's creation of written assessments as to the murder.  And the Government does not contend that there is a meaningful difference between a written assessment of what happened to Mr. Jamal Khashoggi and a report on the same subject.

Second, OSJI points to President Trump's acknowledgment of the CIA's analysis of Mr. Khashoggi's death.  *See* Pl. Br. at 5.  In an interview on November 23, 2018, in response to a question about whether the CIA had concluded that the Saudi Crown Prince was involved in Mr. Khashoggi's death, the President stated:

> They didn't conclude.  No, no, Josh, they didn't conclude.  I'm sorry. . . .  No, they didn't conclude. They did not come to a conclusion.  They have feelings certain ways, but they didn't . . . .  The CIA doesn't say [the Saudi Crown Prince] did it.  They do point out certain things.  And in pointing out those things, you can conclude that maybe he did or maybe he didn't. . . .  They said he might have done it.  That's a big difference

*Presidential Trump Teleconference with Military Members*, C-SPAN, at 34:18–35:22 (Nov. 22, 2018), https://www.c-span.org/video/?454931-2/presidential-trump-teleconference-military-members; Def. Opp'n at 20; Pl. Reply at 7.[4]  Consistent with Director Haspel's

---

[4] One aspect of the transcription above—the words the President spoke at the point where the second set of ellipses appears—is disputed by the parties.  OSJI contends that the statement at

testimony, the natural inference from this statement is that the CIA—in some form of prepared presentation—has identified arguments and counterarguments as to who was responsible for Khashoggi's death.  While the President does not state whether this product took the form of a report or some other prepared assessment, the President's statements also reveal the existence of a CIA-prepared work product as to Khashoggi's death and the potential involvement of the Saudi Crown Prince therein.

Read in combination, Director Haspel's remarks and the President's statements supply an official acknowledgment that the CIA created a written product analyzing Khashoggi's killing. These public disclosures as to the CIA's written products satisfy the *Wilson* test, requiring the CIA to produce a *Vaughn* index stating the subject matter of the record(s) and the agency that produced it.  Because the subject matter of the "written products" (an "assessment of what happened to Mr. Jamal Khashoggi") and the agency that produced it (the CIA) have already been disclosed, this disclosure matches the information previously released and is as specific as the information previously released.  *See Wilson*, 586 F.3d at 186 (requiring the official disclosures to be "as specific as the information previously released," and "matching the information previously disclosed"); Def. Opp'n at 19.  As with the tape of the killing, however,

---

that point was: "[t]hey have feelings certain ways, but they didn't—**I have the report**."  Pl. Mem. at 5 n.11 (emphasis added) (citing Kate Sullivan et al., *Senate Dem on Armed Services panel: Trump lying about CIA report on Khashoggi*, CNN (Nov. 23, 2018), https://www.cnn.com/2018/11/23/politics/senate-dem-armed-services-cia-khashoggi/ index.html).  The agencies counter that that is incorrect and that the President stated:  "They have feelings certain ways, but they didn't **have the report**."  Def. Opp'n at 20 (emphasis added) (citing *Remarks by President Trump in Thanksgiving Teleconference with Members of the Military*, White House (Nov. 22, 2018), https://www.whitehouse.gov/briefings-statements /remarks-president-trump-thanksgiving-teleconference-members-military).  The Court has listened to the tape and finds it inconclusive whether the President used the word "I" and if so, whether, as OSJI posits, he did so as the antecedent to the verb "have" or as the last word in a then-interrupted train of thought.  The Court's analysis does not turn on the resolution of this dispute.

the CIA is not obliged—on the current record—to go beyond these data points, as the Court has not been presented with official statements revealing these particulars.  The limited disclosure ordered here will not reveal as-yet unrevealed information pertaining to "foreign relations or foreign activities of the United States" and "intelligence sources and methods."  *See* Def. Mem. at 9–12; Def. Opp'n at 9.

### 3.    Ultimate Conclusion of the CIA Report

OSJI also argues that the Government has officially disclosed not only the existence of a CIA report assessing responsibility for Khashoggi's murder, but also, via President Trump's remarks, the report's ultimate conclusion.  Pl. Reply at 7.  In so arguing, OSJI points to the President's November 23, 2018 statement, also quoted above:

> They didn't conclude. . . .  They did not come to a conclusion.  They have feelings certain ways, but . . . .  The CIA doesn't say [the Saudi Crown Prince] did it.  They do point out certain things.  And in pointing out those things, you can conclude that maybe he did or maybe he didn't. . . .  They said he might have done it.  That's a big difference.

Def. Opp'n. at 20; Pl. Reply at 7.  Noting that its FOIA request sought "the CIA's findings on and/or assessment of the circumstances under which he was killed and/or the identities of those responsible," Pl. Mem. at 8–9, OSJI argues that the President's statements that the CIA concluded that the Crown Prince "might have done it" satisfies the *Wilson* test, compelling the disclosure of the CIA report's ultimate conclusion.

Although OSJI's argument is not implausible, the Court does not find the President's casual locution in this interview to clearly acknowledge the conclusion in the CIA's written analysis.  The statement reflects an acknowledgment that the agency identified strands of evidence pointing in both directions.  But, beyond revealing that the report did not reach an ironclad conclusion in either direction as to the Prince's culpability, the President's halting and

indistinct characterizations fall short of revealing the report's actual findings.  The President's remarks can be read consistently with a range of non-polar outcomes as the agency's ultimate view.  The official statements identified by OSJI therefore do not satisfy *Wilson*'s requirement of a specific official acknowledgment sufficient to waive FOIA Exemption One.  *See Osen LLC*, 969 F.3d at 110 ("[P]rior disclosure of 'general descriptions' does not waive Exemption 1 for withheld documents.").  Nor does the Court find the statements quoted above sufficiently specific so as to justify review *in camera* by the Court to determine how closely the President's words match the Report's conclusion.

### C.      FOIA Exemptions Three, Five, and Six

The Government separately invokes FOIA Exemptions Three, Five, and Six.  But none of these exemptions support withholding the limited disclosures in a *Vaughn* index that the Court has ordered.

#### 1.      FOIA Exemption Three

Exemption Three "permits an agency to withhold records that are 'specifically exempted from disclosure by statute.'"  *Murphy v. Exec. Office for U.S. Att's*, 789 F.3d 204, 206 (D.C. Cir. 2015) (quoting 5 U.S.C. § 552(b)(3)).  To withhold the records on this ground, "the Agency must show specifically and clearly that the requested materials fall into the category of the exemption."  *Hayden*, 608 F.2d at 1390.

The agencies here point to the National Security Act's protection of "intelligence sources and methods" from unauthorized disclosure, 50 U.S.C. § 3024(i)(1), and the CIA Act of 1949's protection of "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency," 50 U.S.C. § 3507, as the relevant withholding statutes.  Def. Mem. at 17–19 & n.9; Public Shiner Decl. ¶ 19; Public Gaviria Decl. ¶¶ 32, 34.  The National Security

Act provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). And the CIA Act exempts the agencies from "the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507. The agencies rely upon § 3024(m) of the National Security Act, which provides:

> [T]he [DNI] may exercise with respect to the personnel of the [ODNI] any authority of the Director of the Central Intelligence Agency with respect to the personnel of the [CIA] under the [CIA] Act of 1949, and other applicable provisions of law, as of December 17, 2004, to the same extent, and subject to the same conditions and limitations, that the Director of the Central Intelligence Agency may exercise such authority with respect to personnel of the [CIA].

Def. Mem. at 19 (quoting 50 U.S.C. § 3507) (alterations in original) (citations omitted).

Be that as it may, the agencies fail to explain why either Act's protections apply to the disclosure of the two responsive records whose inclusion on a *Vaughn* index the Court has ordered here: the tape of the Khashoggi killing and the CIA report. A "no number, no list . . . response [is] only . . . justified in unusual circumstances, and only by a particularly persuasive affidavit." *N.Y. Times I*, 756 F.3d at 121–22 (quotations omitted). In neither their public nor their classified filings do defendants explain at all why the disclosure of the limited information conveyed about these disclosed items on a *Vaughn* index that only includes the information about these records already disclosed would reveal intelligence sources and methods. *See* Public Shiner Decl. ¶¶ 19–20; Public Gaviria Decl. ¶¶ 32–34. Defendants' suggestion to this effect is conclusory only. This exemption does not protect these items from disclosure.

### 2.    FOIA Exemption Five

The agencies also briefly invoke FOIA Exemption Five. It, however, is irrelevant to the limited disclosures ordered here. Exemption Five protects from disclosure "inter-agency or

intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999)). The agencies, however, do not develop any argument why this exemption justifies keeping classified—and off of a *Vaughn* index—the top-line descriptions of the tape of the killing and the CIA's report.

### 3.  FOIA Exemption Six

Finally, the agencies briefly invoke FOIA Exemption Six. It exempts from disclosure information from personnel, medical, or other similar files where disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This exemption is also irrelevant to the identification on a *Vaughn* index the Court has ordered.

### D.  The Agencies' Searches Were Adequate

OSJI also faults the agencies for failing to satisfy their burden to show that their searches for responsive records were adequate. The Court, however, finds these searches adequate.

At the summary judgment stage, in response to a challenge to the adequacy of its search for requested records, an agency has the burden of showing that it complied with FOIA. "Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190–91 (2d Cir. 2012). Such agency affidavits "are accorded a presumption of good faith." *Id.*

Antoinette B. Shiner, Information Review Officer for the CIA's Litigation Information Review Office, attested in a publicly filed declaration that experienced CIA personnel "consulted with Agency officials knowledgeable about the subject matter of the requests in order to ascertain the potential universe of responsive records and to identify all of the specific offices and individuals who would be likely to possess those documents if they were to exist."  Public Shiner Decl. ¶ 9; Def. Mem. at 7.  Agency personnel "ran a list of terms identified by subject matter experts through each of the records systems identified as likely to contain responsive material should it exist."  Public Shiner Decl. ¶ 9.  These "[s]earches were conducted in all locations in which it is reasonably likely that responsive records would reside, and used search terms and methods reasonably calculated to locate those documents."  *Id.*  Similarly, Patricia Gaviria, Director of ODNI's Information Management Division, explained in a publicly filed declaration that ODNI personnel with records expertise "identified the components that would likely possess potentially responsive documents, if they were to exist, and asked each of those component to have everyone in that component who would likely have responsive documents to search all places likely to contain responsive documents."  Public Gaviria Decl. ¶ 20.

OSJI nevertheless argues that these "public declarations do not provide any information about the search terms or the 'search strategies' of the components charged with responding to the request, and thus 'lack[] the detail necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search.'"  Pl. Mem. at 23 (citing *Morley v CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007)).  The Court, however, has reviewed the agencies' classified filings.  In conjunction with the agencies' public declarations, these provide sufficient factual detail to persuade the Court that the searches were adequate and reasonably calculated to discover the requested records.  And, because OSJI has not articulated a good reason to conclude that the

searches were made other than in good faith, the Court finds that the public and classified declarations submitted on behalf of the CIA and ODNI demonstrate that the agencies have satisfactorily searched for responsive records. *See Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993) ("However, if an agency demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith.").

## CONCLUSION

The Court therefore grants in part and denies in part each side's motion for summary judgment. As more fully discussed herein, the CIA and ODNI are ordered to produce a *Vaughn* index, limited to the two items (the tape of the killing of Jamal Khashoggi and the CIA's report on the killing) whose existence and possession the Court has found to have been officially acknowledged. This index is due two weeks from today. In addition, all parties are directed to confer and submit a joint letter as to the next steps in this litigation, also due two weeks from today. The Clerk of Court is respectfully directed to close the motions pending at dockets 111, 123, and 128.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: December 8, 2020
New York, New York